## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## IINDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **JOY L. NOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 1:15-cv-0011-TWP-DKL** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Joy L. Noe brought this action, seeking judicial review of the decision of the Acting Commissioner of Social Security denying her applications for a period of disability and disability insurance benefits under Title II of the Social Security Act (the "Act") and for supplemental security income benefits ("SSI") under Title XVI of the Act.  *See* 42 U.S.C. §§ 405(g), 423(d), 1382c(a).  District Judge Tanya Walton Pratt designated the undersigned to issue a report and recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  The undersigned recommends that the decision be affirmed.

## I.    Background

Noe alleges that she became disabled on May 1, 2005 because of an injury to her left leg, degenerative disc disease, anxiety, bipolar disorder, and asthma. Noe was 40 years old on the alleged disability onset date.  She has a high school education and past work experience as an account service clerk, accounts receivable clerk, and certified

nursing assistant.   Noe's claims were denied initially and on reconsideration.   She requested a hearing, which was held on July 2, 2013, before Administrative Law Judge James R. Norris.   Noe, who was represented by counsel, testified at the hearing.   A medical expert, Paul Boyce, M.D., certified in internal medicine; a psychological expert, Jack Thomas, Ph.D., certified in clinical psychology; and a vocational expert ("VE"), Michael Blankenship, also testified.

The ALJ found that Noe met the insured requirements of the Act through December 31, 2010.  Using the five-step inquiry for social security claims, *see* 20 C.F.R. §§ 404.1520(a), 416.902(a), the ALJ first found that Noe had not engaged in substantial gainful activity since the alleged disability onset day of May 1, 2005.  At step two, the ALJ determined that Noe had severe impairments of status-post left ankle fracture, status-post ORIF (open reduction and internal fixation—surgery to repair a broken bone), degenerative disc disease, status-post lumbar discectomy, degenerative joint disease, hepatitis-C, mood disorder, panic disorder, and social phobia.  [R. 25.]  Finding that none of these met or medically equaled the severity of a listed impairment, the ALJ assessed Noe's residual functional capacity ("RFC").  [R. 26-28.]   The ALJ found that Noe could:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand for a total of 6 hours in an 8-hour day for an hour at a time, and walk for a total of 6 hours in an 8-hour day for an hour at a time. She has no restrictions with regard to her ability to sit. She can perform occasional repetitive motions with the left lower extremity and she can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds, and only occasionally bend, stoop, crouch, and crawl. She can perform no work at unprotected heights or in close proximity to dangerous, moving machinery. As to her mental capabilities, the work performed should require no contact with general public and only superficial contact with co-workers and supervisors.

2

[R.28.]  At steps four and five, the ALJ found that Noe was unable to perform any of her past relevant work, but that given her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform, including collator operator, router, and silver wrapper.  [R. 38-39.]  Therefore, the ALJ concluded that Noe was not disabled under the Act.  [R. 40.]  The Appeals Council denied review, and Noe filed this action, seeking judicial review of the decision denying her benefits.

*Physical Impairments*

In March 2006, Noe was injured in a motor vehicle accident and suffered an "open distal tibia-fibula fracture," which required open reduction internal fixation surgery.  [R. 280.]  Following surgery, she had some complications with healing, including an infection, for which she was hospitalized.  [R. 287.]  She was again briefly hospitalized in September of that year for an infected left ankle.  [R. 284.]  In December 2007, Noe went to the emergency room due to chronic pain in her left ankle.  She was diagnosed with a sprain/strain and discharged home.  [R. 389-90.]

In June 2007, following a fall causing neck, lower back and pelvic pain, Noe had x-rays.  The x-rays showed a "[n]ormal cervical spine" [R. 403], an "[a]natomic bony lumbosacral spine with no acute abnormality," [R. 405], and a normal pelvis.  [R. 404.]  Noe visited the emergency room in May 2009, complaining of low back pain and a history of chronic back pain.  She was diagnosed with low back pain and sciatica [R. 381] and was released to return to work/school in four days without restriction.  [R. 382.]

3

In August and September 2011, Noe reported that her medication was working well for pain management and control for her lower back pain.  [R. 322-23.]  However, in September, she complained of reduced flexion and radiation down her right leg.  [R. 322.]

In late November 2011, Noe sought treatment for sudden severe low back and hip pain that came on when she bent over.  She rated her pain as a 10 on a scale of 1 to 10, with 10 being high.  Noe was unable to bear weight on her left leg.  [R. 308.]  She had a CT scan of her lumbar spine and was diagnosed with a "disc herniation on left laterally at L3-L4 and focal disc bulge or prolapse laterally on the left at L4-L5 as well."  [R. 308, 436.]  She was prescribed Percocet for pain, Flexeril for muscle spasm, and Naprosyn for pain and inflammation.  [R. 305-06.]

On December 1, 2011, Noe was evaluated by neurosurgeon Robert Sloan for severe left leg pain and numbness.  [R. 452.]  He noted that the week before, "without associated trauma," Noe "developed acute onset of severe left leg pain and numbness which radiates down to the knee.  She [has] been unable to stand or bear weight since the onset of her pain."  [*Id.*]  Dr. Sloan noted that Noe was in "moderate distress secondary to leg pain, in a wheelchair, [and] unable to stand."  [*Id.*]  She had "decreased sensation [in] left thigh to knee" but she had normal strength and "normal gait."  [*Id.*]  Dr. Sloan diagnosed a herniated lumbar disc at L3-4 and left L4 radiculopathy.  [*Id.*]  He ordered an MRI of Noe's lumbar spine, which confirmed mild disc degeneration at L3-L4 and L4-L5 with nerve root compression at L3.  [R. 324-25.]

Noe saw Dr. Sloan again on December 6.  He noted that she had episodes of her leg giving out and that she walked "leaning forward with a limping gait."  [R. 456.]  She

4

had decreased sensation in her left thigh.  [R. 457.]  Dr. Sloan diagnosed left herniated disc at L3-L4 and left L3 radiculopathy.  [*Id*.]  "Given the imaging findings, symptoms, and failure to improve with conservative treatment, [Dr. Sloan] believe[d] [Noe] would benefit from a [microlumbar discectomy]."  [*Id*.]

Noe was treated by Nurse Lisa Ferrin, LP, on December 12, 2011 for lower back pain.  The nurse wrote that Noe was in a lot of pain and was unable to stand up straight, but she also wrote that Noe's pain was managed with medication.  [R. 319.]  Noe was prescribed Oxycodone, Norco, Flexeril, and Neurontin.

On December 23, 2011, Dr. Sloan performed a microlumbar discectomy at L3-L4 on Noe.  [R. 327.]  Approximately one month later, Noe reported that "the pain is significantly better than before surgery" yet she still complained of back pain and pain in the left groin radiating into the thigh.  [R. 473.]  She had avoided all strenuous activity and heavy lifting since the surgery.  Dr. Sloan wrote that Noe "has progressed well since surgery" and that her left groin and thigh pain "will likely continue to improve with time."  [R. 474.]  He prescribed Norco and wanted Noe to start taking on Naproxen.  [*Id*.]

In March and April 2012, Noe saw Nurse Ferrin for complaints of back pain.  It was noted that Noe had a lot of pain and there was a possibility of another back surgery.  [R. 316, 315.]  However, Nurse Ferrin noted that Noe's pain was managed with the pain medication.  [*Id*.]  Also in March and April, Noe underwent a course of physical therapy.  It was noted that she had a 5 pound lifting restriction.  [R. 597.]  She was having complications from ovarian issues that seemed to be contributing to her pain.  [R. 560.]  Noe was discharged from physical therapy on April 23 with the recommendation to

5

follow up with her physician "as needed." [R. 560.] The therapy goals of increasing Noe's activity of daily living and decreasing pain were "partially met." [*Id.*] The physical therapist wrote that Noe "has demonstrated improved strength and ROM [range of motion] since beginning therapy." [*Id.*]

From September 2012 through March 2013 Noe saw Nurse Ferrin on a monthly basis for complaints of low back pain. Although the nurse noted decreased range of motion, joint pain/edema, and muscle weakness, she also noted on each visit that Noe's pain was managed with medication (Oxycodone, Narco, Neurontin). [R. 603-09.] Then in January 2013, Nurse Ferrin wrote that Noe was experiencing increased joint pain and needed to take more Oxycodone for relief. [R. 605.] The nurse also noted that Noe's anxiety was controlled with Xanax.

On April 17, 2012, Noe followed-up with Dr. Sloan. He noted that she continued in physical therapy for her ankle and groin pain, but that she "feels that the pain related to the disc herniation has resolved." [R. 479.] Dr. Sloan stated that he was "happy with [her] progress and will not schedule any additional follow-up." [R. 480.]

A non-examining state agency review physician reviewed the records and found that none of Noe's physical impairments was severe. [R. 446.] That assessment was affirmed by another non-examining state agency review physician. [R. 518.]

*Opinion Evidence and Consultative Examinations*

On April 3, 2012, Noe had a mental status consultative examination with Eric M. Gudan, Psy.D. He diagnosed mood disorder due to ruptured and degenerated discs,

6

panic disorder without agoraphobia, and social phobia.  [R. 333.]  He assessed her with a GAF score of 58, which corresponds to moderate symptoms or moderate difficulties in social functioning.  Dr. Gudan opined that despite her anxiety, Noe "was able to interact effectively with [him]" during the interview and "likely she would be able to interact with coworkers at least on a superficial level."  [R. 334.]  "Dealings with customers may be more challenge," he wrote, but Noe appeared "able to handle routine changes in her work environment."  [*Id.*]

A non-examining state agency review psychologist found in April 2012 that Noe had a mild restriction in activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and moderate difficulties in maintaining social functioning.  [R. 346.]

On January 2, 2013, Nurse Ferrin completed a residual functional capacity questionnaire concerning Noe's impairments including anxiety, depression, borderline bipolar, back and leg pain, diverticulosis, Hepatitis C, and abdominal pain.  [R. 524.]  She identified symptoms of left leg pain and back pain and stated that Noe's symptoms constantly would be severe enough to interfere with the attention and concentration required to perform simple work-related tasks.  [*Id.*]  She indicated that Noe's prognosis as "not well."  [*Id.*]  Nurse Ferrin identified the following side effects from Noe's medications: "throw up all the time, tired, dizzy" and "upset all the time."  [*Id.*]  She also opined that Noe would have to recline or lie down during an 8-hour work day and that she could sit and stand/walk for only 15 minutes at a time, and could sit and stand/walk

for 0 to 1 hours in an 8-hour workday.  She repeatedly wrote that Noe "can't work" and "can't lift over 5 pds [pounds] now."  [R. 524-25.]

Noe had a mental status examination on April 23, 2013 with by Michael O'Brien, Psy.D., who diagnosed panic disorder without agoraphobia, a phobia of riding/driving in a vehicle, depressive traits, and posttraumatic and social phobic traits.  [R. 617.]  Dr. O'Brien opined that if Noe was "physically capable of the task(s) in question, then [she] can understand, remember and carry out simple directions" and "adapt to routine changes in the workplace setting."  [R. 617.]  He also found that "[w]hen  not in the throes [sic] of a panic attack, [she] can focus and concentrate well enough to carry out simple tasks" and "relate to others, on a superficial basis, in a workplace setting."  [*Id.*]  However, because she was out of medication at the time, he wrote that Noe "has panic attacks fairly regularly."  [*Id.*]  Nonetheless, he noted only mild and moderate limitations in her current state without medication.  [R. 620-21.]

On May 4, 2013, Mauro Agnelneri, MD, examined Noe at the request of the state disability determination bureau.  He noted that she was seeking disability for injury to her left leg, asthma, degenerative disc disease, and mental health problems.  [R. 630.]  He noted that she had 7 operations on her left leg in 3 years and had disc surgery in 2011.  [R. 630.]  Noe stated that she had pain that shoots in her right leg and that her right leg is numb.  [*Id.*]  On examination, Dr. Agnelneri found mostly normal findings, however, forward flexion of the lumbosacral spine was limited to 40 degrees, extension was limited to 10 degrees, and lateral bend was limited to 15 degrees.  [R. 632.]  Yet straight leg raising tests were negative bilaterally, though Noe complained of pain in her back but no pain

radiating into her legs.  [*Id.*]  Her left ankle had limited dorsiflexion and plantar flexion. [R. 633.] Dr. Agnelneri noted that Noe's gait "is not stable," that she "walks with a severe limp favoring her right leg" and she was "not able to walk on bilateral heels and bilateral toes."  [*Id.*]  He concluded that Noe has continuing pain and marked limitation in range of motion of her left ankle.  [*Id.*]

According to Dr. Agnelneri, Noe could never left or carry up to 10 pounds, a conclusion for which he cited the "not supposed to carry over 5 lbs" restriction.  [R. 624.] He indicated that she could sit, stand, and walk for 15 minutes at a time and for a total of 2 hours in an 8-hour work day and would need to be laying down the rest of an 8-hour period.  [R. 625.]  He identified no medical or clinical findings that supported his assessment as to Noe's limitations in sitting, standing, and walking, although space was provided on the form in which to do so.  [R. 625.] Dr. Agnelneri imposed other limitations on Noe's physical activities, but by drawing the null sign in the space provided for supporting his assessments, he indicated that no medical or clinical findings supported those assessments.  [R. 626-28.]

*Hearing Testimony*

Dr. Boyce testified at the hearing that Noe did not have any impairment that met or equaled a listed impairment.  [R. 55-56.]  He stated that Noe would be limited to light work; she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; she could sit without restrictions with normal breaks and lunch hours; she could stand for one hour at a time, for a maximum of 6 hours in a day; she could walk up to one hour at

a time, for a total of 6 hours a day; she had no restriction on pushing and pulling with her upper extremities; her left lower extremity would be restricted to only occasional, repetitive motion; she had no restrictions on the right lower extremity; she could do ramps and stairs occasionally, but not ropes, ladders, or scaffolds; she could bend, stoop, crouch, crawl, kneel all on occasion. [R. 56-57.] Dr. Boyce noted no manipulative, visual, or communicative restrictions. [R. 57.] He precluded her from unprotected heights and working with dangerous, moving machinery because of the medication she takes. [*Id.*]

Dr. Thomas testified that he examined the evidence and found a severe mental impairment. Because of Noe's anxiety, he would restrict her to no contact with the public and only superficial contact with coworkers and supervisors. [R. 64-65.]

Noe testified to limited abilities and activities. She said she can sit for 30 minutes, stand for 20 minutes, walk 1 block, and has to lie down 15 times a day. She said she cannot stand to do the dishes. [R. 65-67.]  Noe stated that she experiences anxiety-based panic attacks at least twice a day.

## II.    Discussion

Judicial review of the ALJ's decision is limited. *See Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). The decision will be upheld so long as the ALJ applied the correct legal standard and the decision is supported by substantial evidence. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d

at 718 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).  A court may not reweigh the facts or evidence or make its own credibility determinations.  *Id.*

An ALJ need only "minimally articulate" her reasons for rejecting or accepting evidence, including a treating source's opinion, which is a very "lax" standard.  *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).  An ALJ does not have to mention every piece of evidence, but must build a "logical bridge" from the evidence to her conclusions.  *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

*Weighing of Medical Opinions*

Noe first contends that the ALJ erred in rejecting the opinions from consultative examiner Dr. Agnelneri and treating nurse Ferrin in favor of the opinion of the non-examining expert Dr. Boyce.  Noe suggests that the ALJ erred in adopting, in its entirety, Dr. Boyce's opinion as to her RFC, but cites no authority that would preclude the ALJ from adopting the opinions of a non-examining, testifying medical expert.  *Compare Hodges v. Barnhart*, 399 F. Supp. 2d 845, 852, 857 (N.D. Ill. 2005) (holding that ALJ did not err in adopting testimony of non-examining medical expert regarding claimant's RFC).

Noe argues that opinions from non-examining physicians, standing alone, are not substantial evidence.  Yet the cases she cites, *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), and *Phillips v. Astrue*, 912 F. Supp. 2d 749, 761 (S.D. Ind. 2012), stand for the proposition that an ALJ cannot reject an examining physician's opinion solely on the basis of a contradictory opinion from a non-examining physician.  Here, the ALJ did not reject Dr. Angelneri's opinions and Nurse Ferrin's opinions on the basis of Dr. Boyce's opinions.

In discussing the weight given to the opinions of Dr. Angelneri and Nurse Ferrin, the ALJ did not even mention Dr. Boyce. Furthermore, the Seventh Circuit has said that an ALJ may discount even a treating physician's medical opinion if it "is inconsistent with the opinion of a consulting physician …, as long as [the ALJ] minimally articulates [her] reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). And neither Dr. Angelneri nor Nurse Ferrin is a treating physician, whose opinions are generally accorded special weight.

But even if a non-examining physician's opinion standing alone is not substantial evidence, Dr. Boyce's opinions did not stand alone. In assessing Noe's RFC, the ALJ considered the medical evidence and other evidence in the record. The RFC assessment was also based in part on the ALJ's credibility determination.

Moreover, the ALJ gave good reasons for affording little weight to the opinions of Nurse Ferrin and Dr. Agnelneri. First, consistency with substantial evidence in the record is an appropriate consideration in weighing medical opinions. *See Schmidt*, 496 F.3d at 842; 20 C.F.R. § 404.1527(c)(4). The ALJ determined that Nurse Ferrin's opinion that Noe was "not physically capable of working" was "inconsistent with the totality of the evidence." [R. 33.] That finding is well-supported by the record, including Noe's lack of treatment over various time periods and Dr. Boyce's testimony. Second, an ALJ may discount a treating source's opinion if it is internally inconsistent. *See Schmidt*, 496 F.3d at 842. The ALJ found an inconsistency between Nurse Ferrin's opinions and her treatment notes. Although she opined that Noe was unable to work mostly because of pain, over the course of her treatment, Nurse Ferrin consistently noted that Noe's pain

was managed by medication.  While Noe was taking strong narcotic medication such as
Oxycodone and Norco, and pursued treatment other than medication, namely surgery
and physical therapy, the record supports the conclusion that generally her pain was
managed by medication.  In fact, in April 2012, Noe told Dr. Sloan that the pain related
to the herniated disc had resolved.

Third, the ALJ reasoned that Nurse Ferrin "relied quite heavily on the subjective
report of symptoms and limitations provided by [Noe], and also seems to have
uncritically accepted as true most, if not all, of what [she] reported." [R. 34.]  But the ALJ
found good reasons for questioning the reliability of Noe's subjective complaints.  [*Id.*]
Fourth, the ALJ explained that Nurse Ferrin found that Noe could not lift over 5 pounds,
apparently in reliance on her physical therapy treatment notes, which reflected a 5-pound
lifting restriction following her December 2011 discectomy.  The ALJ found that there
was nothing to suggest that this restriction was permanent [R. 34], and the physical
therapy notes suggested Noe's strength had improved since surgery.  [*Id.*]  Although the
5-pound restriction is repeated throughout the physical therapy notes, the ALJ was
correct in finding no indication that the restriction was a permanent one.  And there is
evidence from the medical expert Dr. Boyce that Noe was not limited to 5 pounds.

The ALJ also was critical of a lack of specificity in Nurse Ferrin's opinions, which
standing alone might not be a sufficient reason to discount the opinions.  Although an
ALJ must consider the six factors set forth in the regulations, her written decision need
not contain "'an exhaustive factor-by-factor analysis.'"  *Richards v. Colvin*, No. 1:14-CV-
128-TLS, 2016 WL 336808, at *7 (N.D. Ind. Jan. 27, 2016) (quoting *Hanson v. Astrue*, No.

10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) and citing 20 C.F.R. 404.1527(c)(2)-(6)).  Here, the ALJ gave several good reasons for affording Nurse Ferrin's opinions little weight, emphasizing two of the factors (supportability and consistency), and that is enough.  *See Elder*, 529 F.3d at 415-16 (ALJ did not err in discounting treating physician's opinion where ALJ discussed only two of the relevant factors).  It seems the ALJ misread Nurse Ferrin's prognosis as "not sure"; it appears that she wrote that Noe's prognosis was "not well."  [R. 524.]  But this error was harmless.  The ALJ provided other good reasons for giving little weight to Nurse Ferrin's opinions.

The ALJ also gave good reasons for affording little weight to Dr. Agnelneri's opinions about Noe's physical abilities.  First, the ALJ observed that Dr. Agnelneri failed to provide support for his opinions.  The medical source statement he completed requested "particular medical or clinical findings" that supported the assessment of limitations.  Other than stating that Noe was "not supposed to carry over 5 lbs" [R. 624], however, the physician identified no medical or clinical findings to support his assessment as to Noe's limitations.  The 5-pound limitation was cited only in support of the assessment of Noe's ability to life and carry.  As noted, the ALJ found no indication that this limitation was meant to be permanent in nature.   Further, by drawing the null sign in the space provided for findings, Dr. Agnelneri indicated that there was no medical or clinical findings to support his other assessments.  *See* Institute for Safe Medication Practices, List of Error-Prone Abbreviations, Symbols, and Dose Designations, http://www.ismp.org/tools/errorproneabbreviations.pdf (last visited Feb. 4, 2016).

In addition, the ALJ concluded that Dr. Agnelneri's opinions regarding Noe's physical limitations were inconsistent with his exam notes.  Although the notes include some findings that could support some degree of limitation, as a whole they do not support the highly restrictive limitations found.  Dr. Agnelneri noted limited range of motion in the lumbosacral spine and marked limitation of range of motion in the left ankle; he noted that her gait was not stable and she walked with a severe limp.  But his other findings were unremarkable.  For example, he found no tenderness or spasms in Noe's lumbar spine and her straight leg raising test was negative.  Furthermore, it appeared that Dr. Agnelneri based his opinions on Noe's subjective reports of symptoms and limitations, and the ALJ reasonably found Noe not fully credible.  Noe argues that Dr. Agnelneri based much of his opinions on her ankle condition, not merely her back pain.  Although the record shows a worsening of Noe's ankle in 2013 such that she sought out chronic pain management on July 1, 2013, Noe went without treatment for several months.  And, as the ALJ observed, the fact that Noe didn't seek out treatment again until the day before the ALJ's hearing suggested that she was seeing physicians primarily to build evidence for her application for benefits and appeal.  This is a reasonable inference that the ALJ was permitted to draw.

*Credibility Finding*

Noe challenges the ALJ's adverse credibility finding.  She argues that the ALJ's discussion of the December 1, 2011 treatment note from Dr. Sloan shows that the ALJ was looking only at evidence unfavorable to Noe.  The ALJ was permitted to draw adverse

inferences from the timing of Noe's efforts to seek medical treatment and inconsistencies in her complaints and medical provider's findings.  In December 2011, Noe was in the process of filing for disability based on her left ankle, and claimed "acute onset of severe leg pain" without any associated trauma or explanation.  [R. 452.]  Although Noe claimed an inability to stand or bear weight since the onset of pain, she exhibited a normal gait.  The two seem inconsistent.  As the Commissioner argues, the issue is not whether Noe had an impairment, but whether the resulting symptoms and limitations were as severe as Noe claimed.  Noe argues that she continued to experience pain after the surgery.  Her medical records corroborate this claim.  Nonetheless, in mid-April 2012, Dr. Sloan indicated that Noe "feels that the pain related to the disc herniation has resolved."  [R. 479.]  And near the end of that month, she was discharged from physical therapy.

According to Noe, the ALJ failed to evaluate the effect her significant medications would have on her ability to work.  Noe claimed that her medications caused dizziness, drowsiness, and vomiting.  An ALJ is not required to make specific findings regarding the side effects of prescription medications on the claimant's ability to work.  *See, e.g.*, *Herron v. Shalala,* 19 F.3d 329, 335 (7th Cir. 1994); *Reed v. Colvin*, No. 1:15-CV-00041-RLY, 2015 WL 6702127, at *3 (S.D. Ind. Nov. 3, 2015).  Besides, it seems that the ALJ took the claimed side-effects into account by limiting Noe to "no work at unprotected heights or in close proximity to dangerous, moving machinery," which Dr. Boyce opined would be precluded because of the medications Noe takes.

Noe also complains that the ALJ failed to properly analyze her daily activities.  Yet the ALJ found that Noe "described daily activities which are fairly limited."  [R. 37.]  The

ALJ found Noe not fully credible and thus not as limited as she claimed in light of the "relatively weak medical evidence" and other evidence in the record. [R. 37-38.] Noe has not shown that the credibility finding was "patently wrong," so the Court will not overturn that finding. *See Stepp*, 795 F.3d at 720-21.

*Hypothetical to VE*

The ALJ further erred, Noe argues, in relying on VE testimony based on a hypothetical that failed to account for all her limitations. The hypothetical to the VE needs to include all of the claimant's limitations supported by the medical evidence in the record. *See, e.g.*, *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Here, Noe's complaint is not with an incomplete hypothetical but with the ALJ's weighing of the medical opinions and her adverse credibility finding, which have been addressed.

## Conclusion

For the foregoing reasons, the undersigned recommends that the decision to deny Noe's claims for benefits be affirmed.

## Notice Regarding Objections

Within fourteen days of being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). The district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection may result in forfeiture of the right to *de novo*

determination by the district judge and to review by the court of appeals of any portion

of the recommendation to which an objection was not filed.  *Tumminaro v. Astrue*, 671 F.3d

629, 633 (7th Cir. 2011).

**The parties should not expect extensions of time to file either objections or responses.  No replies will be permitted.**

ENTERED THIS DATE:  02/05/2016

*Denise K. LaRue*

Electronic distribution to counsel of record

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana